# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 9, 2010

No. 08-30721

Lyle W. Cayce
Clerk

RAYMOND WADE,

Petitioner - Appellant

v.

BURL CAIN, WARDEN, LOUISIANA STATE PENITENTIARY,

Respondent - Appellee

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 5:05-cv-876

Before DeMOSS, ELROD, and HAYNES, Circuit Judges.

PER CURIAM:[*]

Raymond Wade was convicted of second-degree murder and sentenced to life imprisonment. After exhausting his state court remedies, Wade filed a habeas petition in the federal district court. The district court denied the requested relief, and Wade appealed. We issued a certificate of appealability ("COA") on several issues related to the alleged denial of Wade's Fourteenth Amendment right to equal protection under *Batson v. Kentucky*, 476 U.S. 79 (1986), including the issue of whether a comparative juror analysis supports

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 08-30721

Wade's *Batson* claims.  Because a comparative juror analysis does not support Wade's *Batson* claims, we affirm.

## I.

As alleged, Wade may only obtain habeas relief on his *Batson* claims by showing that the Louisiana Supreme Court's decision denying his *Batson* challenge was based on an "unreasonable determination of the facts in light of the evidence presented." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting 28 U.S.C. § 2254(d)(2)).  The state court's factual findings are presumed to be sound unless rebutted with clear and convincing evidence.  *Id.* (quoting § 2254(e)(1)).

The Supreme Court articulated a three-step process for adjudicating a claim that a peremptory challenge was based on race—a *Batson* challenge.

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Snyder v. Louisiana*, 552 U.S. 472, 476-77 (2008) (quoting *Miller-El*, 545 U.S. at 277) (Thomas, J., dissenting)) (internal marks omitted).  On appeal, we evaluate "whether the trial court's determination of the prosecutor's neutrality with respect to race was objectively unreasonable and has been rebutted by clear and convincing evidence to the contrary." *Murphy v. Dretke*, 416 F.3d 427, 432 (5th Cir. 2005) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003)).

After the State used three of four peremptory challenges to strike African-American veniremen, defense counsel made his first *Batson* challenge.  He argued that the high percentage of peremptory challenges used against African-Americans established a pattern of excluding African-Americans.  The trial judge noted that he paid extremely close attention to the voir dire proceedings,

No. 08-30721

took copious notes, and was sensitive to the *Batson* issue. He found no prima facie showing that the State used peremptory challenges on the basis of race. However, to preserve the record for review, he noted that he would have the State articulate reasons for striking the jurors at a later time. He further mentioned that the State could keep its voir dire notes.

The State used its next peremptory challenge to strike another African-American, and defense counsel made another *Batson* challenge. Defense counsel stated that the State had used four to five challenges on prospective African-American males. He asserted that this particular panel had nine Caucasians and three African-Americans before challenges for cause and the other panels had been predominately Caucasian. He noted that there were no African-American males on the jury and only two African-American females. Again, the judge found that the first step in *Batson* had not been met and denied Wade's challenge.

After the twelfth member of the jury had been selected, the State used its only peremptory challenge for the alternate jurors to strike another African-American. Defense counsel again objected to the use of the challenge, and the judge noted defense counsel's position and summarily denied the objection. Wade's jury consisted of ten Caucasians and two African-Americans.

The jury found Wade guilty of the lesser included crime of second-degree murder and sentenced him to life imprisonment. He then moved for a new trial on the basis that the State used peremptory challenges to systematically exclude African-Americans from the jury. The judge again found that Wade failed to make a prima facie showing of discriminatory use of peremptory challenges. However, "for appellate purposes," the judge instructed the State to articulate its reasons for striking the African-American veniremen. For each of the struck veniremen, the Stated identified several reasons justifying its use of the strike.

No. 08-30721

The judge found the State's reasons to be race-neutral and denied Wade's motion for new trial. He appealed.

On appeal, Wade specifically complained that the State's reasons for striking Kerrick Martin, Clarence Bell, Sandra Smith Bell, and Foster Dukes, "were not sufficiently race neutral and appeared to be a veiled effort to exclude individuals of the same color as defendant." Agreeing with the trial court, the Louisiana Second Circuit Court of Appeal found the State's reasons for striking the four African-American veniremen to be race-neutral. The Louisiana Supreme Court denied Wade's petition for writ of certiorari.

Wade then sought habeas relief in the Louisiana state courts on various other grounds and after exhausting those claims, moved for federal habeas relief under 28 U.S.C. § 2254 in the Western District of Louisiana. The district court denied all relief.

## II.

The only issue on appeal is whether Wade demonstrated that his *Batson* challenge was denied because of an unreasonable determination of the facts.[1] Although the trial court denied Wade's *Batson* challenge because Wade failed to establish *Batson*'s first step, we have held that "appellate review should not become bogged down on the question of whether the defendant made a *prima facie* showing in cases where the district court has required an explanation." *United States v. Forbes*, 816 F.2d 1006, 1010 (5th Cir. 1987). When the trial court requires the State to articulate its reasons for striking a venireman, even when the trial court does not believe defense counsel met *Batson*'s first step, the appellate court should review the district court's findings on purposeful discrimination. *Id.*; *accord Hernandez v. New York*, 500 U.S. 352, 359 (1991) (plurality) ("Once a prosecutor has offered a race-neutral explanation for the

---

[1] Because the comparative juror analysis resolves all outstanding issues, we need not separately consider each point on which we granted a COA.

4

peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."). Accordingly, our focus is on whether Wade has shown purposeful discrimination.

Wade argues that although the State's reasons for striking the African-American veniremen appear race-neutral, when the court compares the responses of the struck African-American veniremen with the responses of the Caucasian jurors, the State's reasons for striking the African-American veniremen are unpersuasive and not credible.[2] He asks the court to conduct a comparative analysis of the struck veniremen and the Caucasian veniremen.[3]

The Supreme Court articulated a few guiding principles for the court to consider when conducting a comparative analysis which we explained as follows:

> First, we do not need to compare jurors that exhibit *all* of the exact same characteristics. . . . Second, if the State asserts that it was concerned about a particular characteristic but did not engage in meaningful voir dire examination on that subject, then the State's

---

[2] Wade also asserts that the "bare statistics" in this case support a finding of purposeful discrimination. Wade alleges that his venire panel consisted of sixty-six people, twenty of whom where African-American. There is no evidence in the record to support Wade's proposition that his venire panel included twenty African-Americans. Further, the trial court explained any disparity by stating that "there were a number of prospective jurors who were African-American, who indicated that under no way and under no circumstance would they impose the death penalty, which means that they [were] excused for cause pursuant to the law." Wade also argues that there was a jury shuffle and that the State asked juror Ivy Woodard-Latin, a Caucasian woman, the fewest number of questions. The State avers that no jury shuffle occurred and that Woodard-Latin was an African-American woman. Wade failed to direct the court to the portion of the record that supports his position and we have found no indication that a jury shuffle occurred or that Woodard-Latin was Caucasian. Wade's arguments are without merit.

[3] The State argues that we should not consider Wade's comparative analysis argument because Wade never presented the argument to the state court. The State's argument is foreclosed. *See Reed v. Quarterman*, 555 F.3d 364, 374-75 (5th Cir. 2009) (explaining that because the "comparative analysis rests on the entire voir dire transcript" and the voir dire transcript was part of the evidence before the state court, "the comparative analysis, which is a theory that relies upon the voir dire—is properly before this court on habeas review," even if the argument was not made to the state court).

No. 08-30721

failure to question the juror on that topic is some evidence that the asserted reason was a pretext for discrimination. . . . Third, we must consider only the State's asserted reasons for striking the black jurors and compare those reasons with its treatment of the nonblack jurors.

*Reed v. Quarterman*, 555 F.3d 364, 376 (5th Cir. 2009) (emphasis in original) (citing *Miller-El*, 545 U.S. at 246, 247 n.6, 252). With these principles in mind, we compare struck veniremen Martin, Bell, Smith Bell, and Dukes with the non-African-American veniremen accepted by the State.[4]

A.

Regarding venireman Martin, the State asserted at the *Batson* hearing that it struck Martin because he "indicated by his mannerisms and responses that he was unwilling to impose the death penalty" and he seemed "quite weak," "to prefer a sentence of life in prison," and uncomfortable with the death penalty. The judge found the State's reasons to be race-neutral.

Wade was indicted for the first-degree murder of Carlos Wheeler on the theory that Wade killed Wheeler during the course of a robbery. The State sought the death penalty and extensively questioned the venire panels about the

[4] Wade also argues that the State impermissibly struck possible alternate juror Vickie Breakenridge. This claim was not exhausted in state court because Wade failed to present the claim to the highest Louisiana court. *See Mercadel v. Cain*, 179 F.3d 271, 275 (5th Cir. 1999). Additionally, Wade has forfeited any error for failing to present the claim to the district court. *See United States v. Cherry*, 50 F.3d 338, 342 (5th Cir. 1995). However, even if the alleged error was exhausted and preserved, Wade's argument is without merit. The State moved to exclude Breakenridge for cause. During voir dire, Breakenridge indicated that the evidence would have to be "outstanding" for her to consider the "extreme" penalty of death. Although the trial judge denied the State's challenge for cause, he found that the question of whether Breakenridge should be struck for cause was "a close, close call" and that he "certainly [thought] a peremptory challenge should be issued, if there is any doubt by the State . . . ." Given the judge's findings, we cannot hold the state court's denial of *Batson* relief was based on an unreasonable determination of the facts. *See Forbes*, 816 F.2d at 1010 (holding that the district court's observation that "a challenge for cause might have been justified" as to this juror was more than sufficient under *Batson*, which emphasized that "the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause" (quoting *Batson*, 476 U.S. at 97)).

issue. Venireman Martin, when questioned, first indicated that he did not think he would vote against the death penalty. When the judge questioned him further about his position, he stated he was against the imposition of the death penalty. He later stated that he had no strong opinions about the death penalty and that he could consider the death penalty if the evidence called for it. Later, in explaining his position he stated that he could understand the death penalty in a situation with Jeffrey Daumer and Adolf Hitler "[b]ut then in another situation, I am not here as God, and I'm not here to judge anybody, I prefer not death to life imprisonment." Martin's waffling justified the State's conclusion that he would make a weak juror and that he seemed uncomfortable with giving the death penalty.

Wade argues that Clifford Escoval, a Caucasian juror, expressed similar hesitations about the death penalty. The record fails to support this position. Escoval's responses to the voir dire questions consistently demonstrated that he was open to considering the death penalty. The state court's finding of no discriminatory intent in the State's use of a peremptory strike to exclude Martin is not unreasonable in light of the evidence presented.

B.

As to venireman Clarence Bell, the State asserted several reasons for striking Bell including Bell's failure to fill out the juror questionnaire, evasiveness, and inattention. The trial judge found the State's reasons to be race-neutral and specifically noted that Bell was the only juror who failed to fill out the questionnaire.

Wade did not identify another juror the State allowed to serve that exhibited characteristics similar to Bell. Rather, Wade argues that Bell's "failure to fill out the questionnaire could have simply been an [sic] confusion on his part as to whether he was required to complete it prior to or during voir dire." There is no evidence in the record to support that position. Bell's failure

to fill out the questionnaire, however, supports the State's conclusion that Bell seemed evasive. The record also supports the State's position that Bell might not have been paying attention. After extensive questioning about whether he and his fellow veniremen could impose the death penalty, he questioned whether the jury decides punishment. Based on the record before us, we cannot say that the state court unreasonably found no race discrimination as to this venireman.

C.

After Clarence Bell, the State struck Sandra Smith Bell, an African-American woman. The State alleged that it struck Sandra Smith Bell because she had a ninth grade education and it was concerned that she would have difficulty understanding the concepts involved with DNA evidence. Wade does not dispute that Bell only had a ninth grade education. He instead argues that Bell met the requirements to be a juror, nothing in a death penalty case requires a juror to understand DNA evidence, no juror was questioned about whether they understood such evidence, and Escoval, like Bell, had not graduated high school.

In this case, DNA evidence was crucial to connecting Wade to Wheeler's murder. A juror's ability to understand DNA evidence was undoubtedly important to the State. Although the State did not explicitly question the panel about their ability to understand such evidence, we cannot hold that the State's conclusion that someone with a ninth grade education would be less likely to understand DNA evidence was merely a pretext for discrimination. As to Wade's argument that juror Escoval had not graduated high school, his allegation has no record support.[5]

---

[5] Wade asks the court to consider the juror questionnaires as part of the record on appeal. He argues that the questionnaires would support his position that Escoval and others did not graduate high school. Neither party has submitted the questionnaires. Without the questionnaires we are unable to evaluate whether the questionnaires would support Wade's position. Moreover, it is questionable whether this court could properly consider the

No. 08-30721

The State also indicated that it struck Bell because she generally leaned towards giving a defendant a sentence of life imprisonment as opposed to the death penalty. Her voir dire answers support this conclusion. For example, Bell answered "Yes" in response to the question "Would it also be fair to say that if a person intentionally killed another person that you would be more inclined or lean towards giving them a life sentence as opposed to a death sentence?" Wade does not refute this additional reason for striking Bell. The record supports the trial court's finding that the State did not strike Bell for a racially motivated reason. Accordingly, the decision to deny Wade's *Batson* challenge as to Bell was not based on an unreasonable determination of the facts.

D.

Finally, as to Dukes, the State asserted that it struck Dukes because he leaned towards a life sentence in cases where the victim fought back. According to the State, "[a]ny juror who could not intuitively grasp the concept that a person being robbed and attempting to arm themselves in defense is not the aggressor is in my view unfit from the State's prospective [sic] to serve on a capital jury." The State also stated that it believed that if it struck Dukes, Stephanie Losey would become the twelfth juror. Juror Losey consistently stated that she was for the death penalty and could consider it. Venireman Dukes indicated that the only way he could consider the death penalty was if the murder was "preplanned."

Wade admits that "Dukes' voir dire responses may have tended to favor life imprisonment over the death penalty." He argues, however, that the State's explanation that it preferred Losey, a Caucasian woman, to sit as the twelfth

---

questionnaires that were not presented as evidence before the Louisiana Second Circuit Court of Appeal or the Louisiana Supreme Court. *See Miller-El*, 545 U.S. at 241 n.2; *Reed*, 555 F.3d at 374 n.6. Before the Louisiana Second Circuit Court of Appeal, Wade supplemented the record with the voir dire transcripts. He failed to utilize that opportunity to supplement the record with the questionnaires.

No. 08-30721

juror demonstrates that the State's reason for striking Dukes was a pretext for discrimination. The State never referred to Losey's race when it explained why it preferred her over Dukes. The State's desire to have a juror that never wavered on the death penalty question over one who had does not compel a finding of discriminatory motive. The state court's finding of no discriminatory intent in the State's use of this peremptory strike is not unreasonable.

## III.

Wade has failed to demonstrate that the state court's denial of his *Batson* claim was based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, Wade is not entitled to habeas relief.

AFFIRMED.